Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

DENNIS S. ELLIS, an individual,

    Plaintiff,

                CASE NO. CV 07 4498 DDP (CTx)

VS.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, a Pennsylvania
Corporation; KEY BANK USA NA,
an Ohio Corporation; and
DOES 1-50, inclusive,

    Defendants.


VIDEOCONFERENCE DEPOSITION OF
JOHN ULZHEIMER
August 1, 2008
12:04 p.m.
Paul Hastings Janofsky & Walker
600 Peachtree Street
Atlanta, Georgia


Karen F. Gifford, RPR, CCR-B-1887

1       So with the exception of some updates from a
2  couple of months ago is everything in your CV complete
3  and accurate?
4       A.  It is.
5           (Document marked as Exhibit-147.)
6  BY MR. THIBODO:
7       Q.  Mr. Ulzheimer, can you tell me your educational
8  background since high school, please.
9       A.  I have a BS in criminal justice from the State
10 University of West Georgia.
11      Q.  And is that listed on your CV?
12      A.  No, it is not.
13      Q.  Can you tell me why it's not listed on your CV?
14 Is there any particular reason?
15      A.  Never thought to add it.
16      Q.  Going back to your expert witness report, I want
17 to ask you, does the expert witness report that you
18 signed on June 30, 2008, does it accurately state all of
19 the opinions that you intend to offer in this case?
20      A.  Well, it accurately states my opinions of
21 Mr. Tarter's report.  I've been -- obviously, I've got
22 documents that aren't specific to Mr. Tarter's report
23 and may not necessarily be addressed by his report and
24 if subsequently I'm asked for an opinion of those at a
25 later date, then I suppose I will render an opinion on

1  them, but.  So I guess the answer to your question is,
2  no, this -- if you want to define that this is it for my
3  opinion, then I don't know that I'm capable of doing
4  that.
5       Q.  Let me ask you a different question, slightly
6  different.  Are all of your opinions that pertain to
7  Mr. Tarter's report set forth in your report?
8       A.  I recall, and if you look at the date I actually
9  finished this, I put a great deal of work into it over a
10 weekend to get it done, and I recall having to come to
11 an end, verse I could have continued on and on, I guess
12 is my point.
13      Q.  So you ran out of time?
14      A.  Well, I didn't run out of time but I -- there --
15 I could have made this almost twice as thick with some
16 of the issues I found in Mr. Tarter's report, but I,
17 rather than making this 20 pages, I figured I could
18 communicate sufficiently with 12, but I could certainly
19 expand on it if asked to at a later date.
20      Q.  So I guess what I'm trying to ask is whether or
21 not all of the criticisms that you have of Mr. Tarter's
22 report are reflected in your expert report, and what
23 you're telling me is that they are not; is that correct?
24      A.  That's probably fair, yes.
25      Q.  Are you able to tell me today the opinions that

1  prior to writing this opinion, or this, my paper. So
2  this certainly played a part in it.
3        And then here's another later, dated June 18,
4  2007, where he states that he apparently mailed his
5  check to the wrong entity and, therefore, the AES didn't
6  receive it. Within one week of my erroneous mailing I
7  contacted AES to rectify the situation, and then
8  promptly paid his student loan in full.
9        And then let's see. Then a letter dated
10 June 18th -- that might be, yeah, it's the same one.
11 I'm sorry. I have a duplicate copy of a letter. Sorry.
12       That's it. Those are the only two, or three.
13    Q. In the course of preparing your report, your
14 written report, did you go through Mr. Ellis's payment
15 history?
16    A. I did not get a copy of his payment history until
17 after I wrote the report, so, no, I did not.
18    Q. Since writing the report have you gone through
19 Mr. Ellis's payment history?
20    A. Yes, I have.
21    Q. What were you able to determine from going
22 through Mr. Ellis's payment history?
23    A. Well, I'm able to determine that he had 44 late
24 fees since April of 1999, and there's really not,
25 there's not any more information other than just the

1   fact that there's a late fee and the dollar amount and
2   then the date that it occurred.
3       Q.  Are were you able to determine anything else from
4   looking at the payment history?
5       A.  No.  I was focused specifically on the notations
6   of late payment.
7       Q.  Do you know how -- well, first of all, do you
8   know which entity charged the late payment fee?
9       A.  No.  I mean, the letter, this, you know,
10  chronology of payments is on American Educational
11  Services letterhead, but I don't want to make the
12  assumption that that's, in fact, who his checks are
13  written to or who actually charges the late fee.
14      Q.  Do you know who AES is?
15      A.  I've actually never had a student loan so I don't
16  know who AES is.
17      Q.  I mean do you know whether they're affiliated
18  with PHEAA or Key Bank or neither or both?
19      A.  I don't know.  I don't know if they are or
20  aren't.
21      Q.  Do you know what the criteria was for whether or
22  not a late fee would be charged?
23      A.  I do not know what the criteria is, because I --
24  it's my understanding that, just through discussions
25  with defendants' counsel, that Mr. Ellis was frequently

Page 94

1  fee or some other action taken by the lender that
2  doesn't take place until the 10 days later, or 11 days
3  later, I guess.
4  BY MR. THIBODO:
5      Q.  You said there would be different interpretations
6  of when they would be late; correct?
7      A.  Yes.
8      Q.  Is one interpretation that they wouldn't be late,
9  the borrower would not be late until the 11th day?
10             MR. MEEKS:  Objection.  It's still vague and
11 ambiguous.  It's an incomplete hypothetical.
12             THE WITNESS:  Do I answer now?
13             MR. THIBODO:  Yes.
14             MR. MEEKS:  Yes.
15     A.  I think that is another -- if you ask me to list
16 the interpretations or possible interpretations, that
17 would have been another one that I would have listed.
18 BY MR. THIBODO:
19     Q.  The payment history that you have, you didn't
20 receive that until after you wrote your report; correct?
21     A.  That's correct.
22     Q.  Had you discussed the fact that there was a
23 payment history in existence before you wrote your
24 report?
25     A.  Well, there's always a payment history.  Whether

Page 95

1    or not -- when you say -- are you asking if there was a
2    document or are you asking if there's a payment -- I
3    mean, there's a payment history on every loan.
4        Q.  Well, what you're holding there or what you were
5    holding in your hand was a document that's a June 21,
6    2008, letter from AES to Mr. Ellis; correct?
7        A.  June 21, 2007, but, yes.
8        Q.  2007, thank you.
9        A.  Yes.
10       Q.  So there's a June 21, 2007, letter from AES to
11   Mr. Ellis.  My question is, before you wrote your report
12   did Mr. Meeks inform you of the existence of this
13   letter?
14       A.  He -- I don't recall if he did or didn't.  He may
15   have, but it doesn't stick out as a conversation that we
16   had.  I know he had mentioned that Mr. Ellis had a
17   history of being late, and so I make the assumption that
18   he knew that information.  I mean, obviously, counsel
19   isn't going to know that without discussing it with the
20   lender.  But, you know, did I know this specific
21   document existed, I don't recall if it did or didn't.
22   It doesn't stick out as a prevalent issue of our
23   discussions.
24       Q.  Did you ask Mr. Meeks or Miss Dwyer to provide
25   you with some kind of written payment history before you

1  wrote your report?
2      A.  I don't recall if I did or didn't.
3      Q.  Looking at the next page, it's page 5 of your
4  expert witness report.
5      A.  Hey, Todd.
6      Q.  Yeah.
7      A.  My pages aren't numbered.  Can you tell me what
8  the first paragraph starts with.
9      Q.  Actually, mine are not numbered either.  I've
10 just, it's the fifth page of your report.
11     A.  All right.
12     Q.  And the paragraph, it's just a carryover from the
13 previous page.  The Tarter Opinion is, "The credit
14 industry standard requires that if a consumer disputes
15 the status of their account that a credit grantor cannot
16 unilaterally report that the dispute was resolved as it
17 is misleading to other lenders that the consumer
18 concurred."
19     A.  Okay.  We're on the same page, yes.
20     Q.  Do you see that?
21     A.  Yes.
22     Q.  So this is just the fifth page of your report.
23         And you have, your opinion is, "This is simply
24 incorrect.  I've reviewed the credit reports post
25 dispute and the notation is, quote, 'Dispute Resolved,'"